## AUBREY A. CHEEK ET AL. v. J. B. G. PROPERTIES, INC., ET AL.

[No. 814, September Term, 1974.]

*Decided September 8, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*Mark A. Winkler* and *Samuel M. Shapiro* for appellants, cross-appellees.

*William F. Abell, Jr.* and *Joseph M. Quirk,* with whom were *Heeney, McAuliffe, Rowan & Abell* on the brief, for appellees, cross-appellants.

LOWE, J., delivered the opinion of the Court.

The moral disdain one feels for the quick tempered who abuse another with vile or abusive language has not always been equated by the courts with potential civil liability. When Christ said "whoever says to his brother 'Raca,' shall be liable to the Sanhedrin and whoever says,

'Thou fool!', shall be liable to the fire of Gehenna," [1] His opinion was not expressed *vis a vis* First Amendment rights as interpreted by the Supreme Court. While the danger of hell-fire is not lessened by each opinion that Court hands down, the dangers of retribution in this life certainly are. The courts historically — and more so contemporarily — have declined to restrict legally the freedoms of speech and press [2] to the extent they were morally restricted by the Christian religion.

This perhaps arises from the origin of the action.[3] Defamation was treated initially as a dispute to be arbitrated by local seignorial courts in their super-parent roles. As these dissipated, along with the feudalism that sustained them, defamation fell under the aegis of the ecclesiastical courts where it was punished with a penance as a sin. While some defamatory tort action trickled into the civil courts during the sixteenth century, the marked metamorphosis had to await the historically renowned Court of the Star Chamber. The jurisdiction was not gracefully given over by the ecclesiastical courts and was even more grudgingly received from them, by the civil courts, on a case by case basis. With the abolition of the Star Chamber, however, common law courts assumed libel in its entirety, and slander more gradually.

There continued to be recognized a difference between libel, which was criminal as well as tortious, and slander which was not criminal unless made punishable by statute. *Perkins on Criminal Law,* (2nd ed.), at 414. Although not as frequently expressed as in years past, the reverence given the printed word has continued to project libel as the more onerous tort. Indeed, as slander jurisdiction was eased upon the common law courts, they preserved the jurisdictional

---

**1.** Matt. v. 21-23 (Raca — "empty-bodies." Sanhedrin — "Council." Gehenna — "where bodies of criminals were burned after execution.")

**2.** The Supreme Court's recently imposed restrictions on defamation suits arising from matters of general or public interest, Gertz v. Welch, 418 U. S. 323, are not treated here because this case involves a purely private slander action. Sindorf v. Jacron Sales Co., Inc., 27 Md. App. 53.

**3.** See Prosser, *Law of Torts,* (4th ed.) Chap. 19, at 737, et seq.

barrier by requiring proof of "temporal" damage. Prosser, *Law of Torts*, (4th ed.), at 754 citing Holdsworth, *Defamation in the Sixteenth and Seventeenth Centuries.*

The distinction between the two torts has survived the Revolution and appears in Maryland case law in the form of a presumption:

> "There is, however, a distinction between oral and written or printed defamation, and the presumption that words are defamatory arises much more readily in cases of libel than in cases of slander." *Bowie v. Evening News*, 148 Md. 569, 574; See also *Greenbelt Coop. Pub. Ass'n v. Bresler*, 253 Md. 324, 355.

Beyond that presumption and the common sense maxim *"scripta manent, verba volent,"* [4] the primary recognition given the distinction [5] has been based on the extent of the defamation's dissemination resulting from the means of publication used.

One further and basic difference retained is the emphasis placed in slander cases upon the type of damage allegedly done. Arising from the transitional requirement of proof of temporal damages, there arose a practice, if not a rule, that slander is not actionable unless actual damage is proven.

---

4. "Written words remain while spoken words fly away."

5. "A layman, with the narrow outlook of a layman on these affairs, might rashly suppose that it is equally injurious to say at a public meeting, 'Mr. Chicken is a toad,' and to write upon a post card, 'Mr. Chicken is a toad.' But the unselfish labors of generations of British jurists have discovered between the two some profound and curious distinctions; for example, in order to succeed in an action for slander the injured party must prove that he has suffered some actual and special damage, whereas the victim of a written defamation need not; so that we have this curious result, that in practice it is safer to insult a man at a public meeting than to insult him on a post card, and that which is written in the corner of a letter is in law more deadly than that which is shouted from the housetops. My lords, it is not for us to boggle at the wisdom of our ancestors, and this is only one of a great body of juridical refinements handed down to us by them, without which few of our profession would be able to keep body and soul together. *Jus varium, judix opulentus."* A. P. Herbert, *Misleading Cases in the Common Law*, "Chicken v. Ham."

From this grew certain exceptions which did not require allegations or proof of actual damages. They included imputation of a crime or of a loathsome disease and defamations affecting one in his calling. Maryland has added by statute the slander of a female by injuring her character or reputation for chastity. Cts. Art., Sec. 3-501, 502. This type of defamation was considered so obviously detrimental, no proof of any actual harm to reputation or any other damage was required for either nominal or substantial damages. Proof of the statement itself is considered to establish the existence of some damages, *i.e.*, *per se*, and the jury is permitted, without other evidence, to estimate the amount. Prosser, *Law of Torts*, at 754. This oddity of tort law recognized as "the doctrine of presumed damages" (although usually referred to as "general damages") is not applicable, however, to *less substantial slanderous utterances* which become actionable only by reason of some "special damage" [6] (*i.e.*, *per quod*) whereby the claimant has been put to expense or inconvenience as a consequence of the defamatory language; or the loss of some benefit by reason of the wrongful utterance. Poe, *Pleading and Practice*, Tiffany Ed., Vol. 1, Sec. 174, at 132. Accord *General Motors v. Piskor*, 27 Md. App. 95 at 119.

The issue of whether the words used are in and of themselves damaging, *i.e.*, actionable *per se*, is a matter of law for the court's determination. *American Stores v. Byrd*, 229 Md. 5; *Piskor, supra*, at 123.

In the absence of an alternative, the issue may be resolved as a pleading question by a demurrer. *Cf. Thompson v. Upton*, 218 Md. 433. If a plaintiff asserts defamatory language which is not damaging in and of itself and fails to set forth (or to support by specific proof) special damages whereby he was injured (*per quod*), it follows that he cannot recover.

---

**6.** "What constitutes special damages" is treated at some length by Poe, *supra*, Sec. 174, at 132 where he concludes by noting that special damages are not restricted to pecuniary loss but include loss of hospitality of friends. Prosser, *supra*, at 760, et seq. treating the same subject, indicates the need to prove *some* pecuniary damage before the more intangible sufferings may be appended or "tacked on as 'parasitic' to it."

34

## Punitive Damages

Exemplary or punitive damages, as the name connotes, are rather a punishment for and deterrent to wrongdoing than a means of recompensing the victim. To the victim they are a windfall not necessarily related to the injury he has suffered. "Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." Gertz v. Welch, 418 U. S. at 350, 41 L.Ed.2d at 811.

The Court of Appeals early held that punitive damages are not proper in libel and slander cases, unless malice is shown on the part of defendant. Snyder v. Fulton, (1871) 34 Md. 128; Fresh v. Cutter, (1890) 73 Md. 87. Once again, however, the court's decision on whether the utterance was damaging per se may be significant in determining the propriety of punitive damages. Where the words are damaging per se, and there is nothing to rebut the imputation of malice, punitive damages as well as "general" compensatory damages, may be awarded. Shockey v. McCauley, 101 Md. 461.

## The Facts

Appellants,[7] who were tenants in an apartment building, sued their corporate landlord, J.B.G. Properties, Inc. (J.B.G.) and the apartment manager, Alfred A. Flori (Flori) for slander and trespass. It appears that Mr. Flori and an assistant came to the Cheeks' apartment to perform plumbing repairs. An argument ensued in which Mr. Flori, in the presence of guests, was quoted by Mrs. Cheek as saying:

> " 'He wheeled and came up and said 'I have had it with you Cheeks, you have been nothing but trouble makers ever since you moved into the building. You can't control your kids and your son was out playing football and the football hit the window. I came out and the boy told me he could play where

---

7. Mr. and Mrs. Aubrey Cheek individually and as next friend of their children, Debra Ann and Joseph Scott.

he wanted to.' I said 'I don't believe that.' He said 'I watched your daughter break branches off a $50 tree that I just bought.' I said 'I don't believe that.' He said 'It's true, I don't care whether you believe it or not.' I said 'Why didn't you say something to her if she was in the wrong.' He said 'I couldn't be bothered.' He said 'First of all, I thought it was a little girl out there playing football. I asked my wife if it was a boy or a girl and she said it was Joey Cheek.' "

After this outburst she became emotional and went into her bedroom and called her husband. During the period of time between the incident and the trial she was in an emotional state at various times, apparently from this event. Mrs. Cheek was allowed to testify that she had to obtain a prescription for tranquilizers from her doctor.

The jury returned a verdict on May 3, 1974 for each plaintiff against each defendant:

1. Aubrey A. Cheek, against:
   a. Flori—$250 compensatory;   $1250 punitive
   b. J.B.G.— 250 compensatory;    250 punitive

2. Debra Ann Cheek, against:
   a. Flori—$250 compensatory;   $1250 punitive
   b. J.B.G.— 250 compensatory;    250 punitive

3. Joseph Scott Cheek, against:
   a. Flori—$250 compensatory;   $1250 punitive
   b. J.B.G.— 250 compensatory;    250 punitive

4. Eugenia Sue Cheek, against:
   a. Flori—$250 compensatory;   $1250 punitive
   b. J.B.G.— 250 compensatory;    250 punitive

A motion for judgment n.o.v. or for a new trial "or Remittitur" was filed on May 6, 1974. On June 21, 1974 the motion was heard and decided. The trial judge denied the motion for a new trial although he candidly admitted that he "would have reached an entirely different result." While on the one hand noting the difficulty we often have of sensing the flavor of the case from the cold record,[8] the judge

8. "Once again, there was evidence and actions of the witnesses and the

adopted a unique means of ameliorating the result he did not like. He decided that the jury wrongfully apportioned the punitive damages as between the two defendants. He decided that punitive damages were a "joint and several obligation" and could not be apportioned by the jury. He therefore entered judgment n.o.v. for all those punitive damages which exceed $1000. In effect he reduced the punitive damages from a total of six thousand dollars from both defendants, to a total of one thousand dollars presumably to be divided equally among the four plaintiffs in the amount of $250 each.

Seven weeks later, acting sua sponte, he decided that the judgments he had directed be entered as reduced by him "were below the jurisdiction of [the] court" and he therefore:

> "ORDERED, pursuant to Maryland Rule 625 that the Judgments heretofore entered in this case BE and the same ARE hereby vacated, and it is further
>
> ORDERED, pursuant to Maryland Rule 653 that judgments of non-pros shall be entered in this case on the final verdicts. . . ." [9]

The plaintiffs below (appellants here) were apparently

---

parties in the Courtroom in which the Jury could reach that conclusion. You will really never understand this case unless you saw the parties and observed their demeanor in the Courtroom, and from the record that is going to be an impossible flavor or feeling to get. The printed record in this case will not in any way — it is impossible to adequately reflect; I am not even sure a moving picture would adequately reflect the expressions on the people's faces and the feelings that were underlying their testimony in relationship to each other. Once again I am not prepared to upset the verdict on punitive damages but I think the law requires me to give Judgment N.O.V. for all these punitive damages which exceed $1,000."

9. Md. Rule 625 limits the court to a thirty day period of revisory power over its own judgments except in case of fraud, mistake or irregularity, none of which were here indicated.

Md. Rule 653 reads:

> "Where by reason of the verdict of a jury being below the jurisdiction of the court, a judgment of non pros is entered, the record of such judgment shall be a bar to any action founded upon the same cause of action in any court, the limit of whose jurisdiction shall be greater than the amount of such verdict; but the amount of such verdict less such costs as may be adjudged against the plaintiff, shall be a debt from the defendant to the plaintiff, recoverable in the District Court."

satisfied with the verdict of the jury but question the action of the trial court following that verdict. They contend that the court's after-the-fact determination that punitive damages are not apportionable is error, that the entry of judgment n.o.v. reducing the punitive damages to the lowest common denominator was error, and that the entry of judgment non-pros pursuant to Md. Rule 653 was error.

Defendants below countered by cross-appeal. They contend here (among other things) that "the words alleged to have been spoken are not slander *per se* as a matter of law." Because the trial judge left that for the jury to determine as a matter of fact, rather than ruling upon it as a matter of law, we shall reverse. Cross-appellants' tangential issues need not be discussed; however, because we will remand for new trial it is desirable if not necessary that we comment upon issues raised by appellants.

### Slander *Per Se*, A Question of Law

The record reveals that the appellees, who have cross-appealed, excepted to the court's instruction on slander *per se.*

> "MR. ABELL: I would also like an exception to the slander *per se*; I don't think that the language that you can't control your children is specific enough to indicate the charge of any crime. Secondly, the instructions as it goes to the daughter of cutting down tree branches from trees, at her age it would not be a crime in any event. She was a juvenile and this would be my exception on that."

Those portions of the judge's instructions relating to slander *per se* and the damages premised thereon were as follows:

> "The first category of slander is what we call 'slander per quad' or quod, if you are a real purist in Latin. In order for the plaintiffs to recover for the utterance of defamatory words in this class, you must find all of the following. That they were

false, that they were spoken with malice, that they were published and that they caused some specific damage to the plaintiffs.

Now, the words that are alleged to fall into this category are the statement 'You Cheeks have been nothing but troublemakers since you moved in', or words to that effect. Those words, if slanderous, are slanderous per quod. *The second category of slander is what we call 'Slander per se.' That translated means words as such are slanderous. In order for the plaintiffs to recover under this category, you must find only that the words were false and published and that they accused the plaintiffs or any of them of the commission of a crime intended to injure them and their reputation.* You will understand that if you accuse someone falsely of the commission of a crime, you have tended to injure his reputation, so the crucial part about these words of this type is that they must be false as well as published.

Now, the statements that are alleged to fall into this category are the statements allegedly made by Mr. Flori to the effect that 'You can't control your children and I watched your daughter snap branches off a tree I paid $50 for just yesterday', or words to that effect.

* * *

Compensatory damages in a slander case is divided into two parts. We will call the first part special damages. Those are damages which have actually occurred as the natural result of the wrong committed. They include money actually expended, time lost from work as well as pain and suffering, humiliation, mental anguish and so on. If you find that the words were slanderous per quod, those are the only kind of special damages that you can consider. If you find that there were words which were slanderous per se, you are also permitted to

consider in addition to the special damages, general damages. These are damages which the law presumes must necessarily result from the publication of the defamatory matters. Even if there were no special damages shown, you may allow damages to the plaintiffs or any one of them for the value that you assign to the loss of reputation that you are satisfied has been proven as a result of the slander. In addition to the general damages and special damages, which are part of compensatory damages, you don't itemize or break them down, compensatory damages would be a single lump sum or figure encompassing either or both types of damages. In addition to that, the plaintiffs claim punitive damages. Compensatory damages as the name suggests are damages to compensate. Punitive damages on the other hand are damages designed to punish. You may not allow punitive damages unless you find some compensatory damages. If you find some compensatory damages, you will consider whether or not you will allow punitive damages. Punitive damages are designed to punish the defendants for the wrong they have done for two reasons. First, to warn them that they must not do it again and secondly that if anyone hears about their predicament would be dissuaded from doing similar things and getting in such a predicament themselves. If you find that the statements were slanderous per quod, made with malice *or if you find there were statements made slanderous per se,* which case you don't need malice, you may award punitive damages." [Emphasis added].

In *American Stores Co. v. Byrd,* 229 Md. at 15, after a thorough analysis of the historical distinction between slander damaging *per se* and *per quod,* Judge Horney said:

"With respect to the further contention concerning actionability *per se,* we agree that

> ordinarily it is the responsibility of the court, when required to do so, to rule as a matter of law (and not the duty of the jury to find as a fact) whether the words and behavior of a speaker are actionable *per se*. But inasmuch as there was no objection to the instructions, we need not decide in this case whether the slanderous *per se* character of the alleged defamatory words and behavior were properly submitted to the jury."

More recently Judge Levine quoted that same paragraph in *Montgomery Ward and Co. v. Cliser,* 267 Md. 406, 423, but was able to avoid the issue for other reasons:

> "We need not decide whether in this case the issue should have been decided by the court as a matter of law, since we have determined that the words and conduct were actionable per se."

We are not so fortunate; here we must face the issue. The words and conduct were not damaging *per se* and timely exception was taken to the instruction.

Appellants contend that Mrs. Cheek was slandered *per se* since the assertion that she could not control her children charged a violation of Article 26, § 91 [10] (now Cts. Art., § 3-840) and that her children were slandered *per se* by the charge that they broke branches off of a fifty dollar tree. Appellants contend the latter is an indictable offense, although they do not tell us what one can be indicted for if one breaks twigs off of a tree. Presumably they assume the

---

10. That statute reads:

"Any parent, guardian or person having the custody, control or supervision of any child defined by the statutes of this State as a minor without proper care or guardianship, or any person who shall knowingly or wilfully encourage, aid, cause, abet, or connive at such state of absence of proper care or guardianship of a minor, or who shall knowingly or wilfully do any act or acts to directly produce, promote or contribute to the conditions which render such child a minor without proper care or guardianship, or who having the custody, control or supervision of such child, shall wilfully neglect to do that which will directly tend to prevent such a condition, or to remove the conditions that render such a child a minor without proper care or guardianship shall be proceeded against as provided herein."

accusation charged some crime such as malicious destruction of property, Md. Code, Art. 27, § 111. Even allowing for such an assumption, that accusation could hardly be said to have the ominous overtones that a charge in 1808 of poisoning another's horse would carry, and yet so harsh a charge as that was held not to be actionable *per se*. *Chaplin v. Cruikshanks*, 2 H & J 247. The offending words must impute an indictable offense for which corporal punishment is the immediate penalty to be actionable in slander cases,[11] *Griffin v. Moore*, 43 Md. 246; *Dorsey v. Whipps*, 8 Gill 457, and it is hardly likely under our current law and philosophy that the breaking off of a branch or branches of a fifty dollar tree would be such an offense even if the perpetrators had not been juveniles. Cts. Art., § 3-801, *et seq.* (former Art. 26, § 51.)

Nor do we see the charge that Mrs. Check could not control her children as a crime or as such an indictable offense. The juvenile law to which appellants point calls for "wilful neglect" of a parent before the offense is punishable and even then it falls under the juvenile jurisdiction of the circuit court. It is apparent that the language used was intended to offend, but it is certainly not language that the average lay person could construe as charging indictable offenses as a matter of law. *Pollitt v. Brush-Moore Newspapers, Inc.*, 214 Md. 570, 575; *Blumhardt v. Rohr*, 70 Md. 328.

Since we do not know whether the jury verdict awarding punitive and compensatory damages was based on a *presumption* of malice arising from what it erroneously treated as a slanderous *per se* remark, that possibility requires that we reverse and remand for a new trial. An award of compensatory damages on a slander *per quod* theory would require proof, and a jury finding, of actual damages; an award of punitive damages upon that theory

---

11. This is not true in libel cases, Snyder v. Fulton, 34 Md. at 134, because of the "broad and just distinction between spoken words and words written or published." The Court of Appeals recognizes that "The scope of libel is wider than that of slander. . . ." Foley v. Hoffman, 188 Md. at 284; see also Pollitt v. Brush-Moore Newspapers, Inc., 214 Md. 570.

would require proof, and a jury finding of actual malice. *Fresh v. Cutter*, 73 Md. at 92.

As we have indicated, we see no purpose to be served in reviewing the contentions raised by cross-appellants on the issue of trespass. We are concerned with the procedural aftermath of the trial and the reasons given by the court for its action which were the essence of the direct appeal by plaintiffs below. Although our ultimate result would release us from the obligation of responding to the question of apportionment of punitive damages — as yet undecided in Maryland — or the unique procedural wake that flowed from the court's views on that question, we feel that in this instance to apply the "Law of Judicial Parsimony" would result in a "judicial short change." [12]

### Judgment N.O.V.

On June 21, 1974 the court heard cross-appellants' motion for judgment n.o.v. or, in the alternative, for a new trial. Reflecting upon the disparity between the punitive damages assessed against each of the defendants the trial judge said:

> "It is my understanding that punitive damages are joint and several obligations and therefore the verdict as to the punitive damages, and I am positive that the Court's instructions were to this effect, it should be a single verdict of the punitive damages. . . . I am not prepared to upset the verdict on punitive damages but I think the law requires me to give Judgment N.O.V. for all these punitive damages which exceed $1,000.
>
> Madam Clerk, the docket entries will show the fact of this hearing, that the motion for a new trial is overruled—and the motion for n.o.v. is granted as

---

12. The Law of Judicial Parsimony "which states that a court should decide no more than it must. . . . But some courts extend this 'law to the point' of deciding no more than is necessary to get the case off the desk. Judicial Parsimony then becomes judicial short change." 49 Calif. Law Review 831.

> to the judgment of punitive damages only and only
> to the extent that that judgment would be reduced
> to the total of one thousand dollars to be entered
> jointly and severally against all defendants."

We find no authority for the use of judgment n.o.v. to reduce the verdict of the jury. The dispositional authority of the court on the motion heard is limited by Md. Rule 563.

> "If a verdict was returned, the court may allow the
> judgment to stand or may reopen the judgment,
> and either order a new trial or direct the entry of
> judgment as if the requested verdict had been
> directed." Md. Rule 563 b 1.

Although the court might have granted a conditional new trial, *i.e.*, unless plaintiffs agreed to a remittitur, once the new trial was denied the judgment n.o.v. could only be granted or denied but could not be used to amend, reduce or alter a jury's verdict.

### Apportionment of Punitive Damages

It is apparent that the jurors below, without instruction by the court, apportioned the punitive damages among the defendants depending upon their differing degrees of culpability. It is equally clear from the reason assigned by the court for reducing the verdict that they did so contrary to the court's understanding of the law.

It is clear in Maryland, and appears to be generally recognized, that compensatory damages may not be apportioned among joint tort-feasors. The issue as to punitive damages is less clear in Maryland. Courts throughout the country which have met the punitive damages issue are divided. Annot. 20 A.L.R.3d 666. Of approximately eighteen jurisdictions, apportionment is favored two to one. We are persuaded that *Nance v. Gall*, 187 Md. 656, 674 inclines us in the direction taken by the majority of states.

Those jurisdictions favoring apportionment seem to rely on the reasonable view that a jury should be permitted to

vary the damages depending upon the degree of culpability since punitive or exemplary damages are not compensation for injury; instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. *Cf., Gertz v. Welch, supra,* 418 U. S. at 350, 41 L.Ed.2d at 811.

Appellee directs our attention to a Supreme Court case which he argues "disallows an apportionment of punitive damages among joint to ·t feasors." *Washington Gaslight Co. v. Lansden,* 172 U. S. 534. Our reading of that case does not provide us that conclusion. The issue there decided was whether evidence of the wealth of one joint tort-feasor could be introduced so as to subject another joint tort-feasor to unapportioned punitive damages based upon the affluent defendant's ability to pay. The Court said:

"While all defendants joined are liable for compensatory damages, there is no justice in allowing the recovery of punitive damages in an action against several defendants, based on evidence of wealth and ability to pay such damages on the part of one defendant only." *Id.* at 553.

As to the issue of apportionment the Court indicated:

"What the true rule is in such case is not, perhaps, certain . . . . But we have no doubt it prevents evidence regarding the wealth of one of the defendants as a foundation for computing or determining the amount of damages against all." *Id.* at 553.

Although the court below issued no instruction relating to apportionment and was not so requested by either party, it did instruct the jury to consider the financial standing of the appellees.

"In making your award of punitive damages, you will take into consideration what you know from the evidence in this case about the financial standing of the defendants. What may be nothing

more than a drop in a bucket to a rich person may completely wipe out a poor man. What you are trying to do is punish him. In connection with that you have to arrive at an amount that is proper to punish him based upon the financial position you find from the evidence."

It is apparent that if the jury is instructed to consider the wealth and affluence of the defendants for punitive damage assessment, the reasoning of *Washington Gaslight, supra*, is persuasive. Without apportionment of punitive damages, the admission of evidence of wealth of an affluent defendant can be devastating to an impecunious co-defendant who may well be far less culpable.

"And the verdict enhanced by the evidence of the wealth of one defendant, might be collected from the defendant the least able to respond and the least culpable of all, who would thus be mulcted in punitive damages, the amount of which might have been measured by the evidence of wealth of another defendant." *Washington Gaslight*, 172 U. S. at 552.

Such reasoning affirms our view that Maryland should be in the majority of states permitting apportionment of punitive damages.

### Judgment Non-Pros

On August 14, 1974, nearly a month after the Notice of Appeal was filed by appellants, the trial judge filed the following order:

"The Court discovered this date as a result of a review of the docket entries in this case in connection with a Motion for an Extension of time for filing the record in the Court of Special Appeals that this Court by mistake on June 21, 1974, directed the entry of Judgments in amounts which are below the jurisdiction of this Court. The Court is of the opinion that this mistake ought to be corrected. It is therefore this 14th day of August,

1974, by the Circuit Court for Calvert County, Maryland

ORDERED, pursuant to Maryland Rule 625 that the Judgments heretofore entered in this case BE and the same ARE hereby vacated, and it is further

ORDERED, pursuant to Maryland Rule 653 that Judgments of non-pros shall be entered in this case on the final verdicts.

AND IT IS FURTHER ORDERED, that the Clerk shall make appropriate correction of Judgment Records of this Court in accordance with this Order, nunc-pro-tunc."

Proemially we point out that our further comments are desirable dicta rather than conclusively necessary since it is apparent that the appeal and cross-appeal to this Court, noted on July 18, 1974 and July 22, 1974, divested the lower court of authority to issue the order of August 14, 1974, nunc pro tunc or otherwise. *Bullock v. Director of Patuxent Institution*, 231 Md. 629, 633.[12A] As a result of substantial changes in jurisdictional statutes, arising most recently out of the creation of the District Court and the consequent repeal of the jurisdictional statutes for Justices of Peace and related courts (found formerly in Md. Code, Art. 52, Secs. 5, et seq.), the consequences which may arise from an erroneous entering of the judgment non-pros presupposed by Rule 653, such as the instance before us, cause us to comment.

Initially we note our inability to explain the reasoning of the lower court when applying Rule 653 (which is limited to a "verdict of a jury") to a verdict arrived at by the court even assuming it had been "below the jurisdiction of the court. . . ." Furthermore, it is apparent that the rule does not provide an authority for judgment non-pros, but rather presupposing the absence of jurisdiction, it provides for what follows where one is entered. But see *H. J. McGrath Co. v. Wisner*, 189 Md. 260, 268.

---

12A. Also see footnote 9.

It is unfortunate that the court below provided us with no foundation as to its reasoning for its order and we are equally distressed that counsel on either side provided us but cursory assistance justifying or decrying the order. We were told, however, that the $1,000 total to which the judge reduced the punitive damages was to be divided equally among the four appellants, *i.e.*, $250 each. Thus each appellant would have received $250 compensatory and $250 punitive only. Since this totals $500, had that been all that each appellant *claimed*, it would not quite reach the sum permitting a jury trial as of right. Md. Const., Art. XV, Sec. 6, reads:

> "The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of five hundred dollars, shall be inviolably preserved."

Cts. Art., Sec. 4-401 sets the monetary limit of District Court jurisdiction. Sec. 4-402 provides exceptions thereto which exceptions include subsection:

> "(e) *Jury trial.* — (1) In a civil action in which the amount in controversy exceeds $500, a party may demand a jury trial pursuant to the Maryland District Rules."

We can but surmise that the court below assumed either or both of these prerequisites to a right to jury trial as jurisdictional minimum limitations of amounts *recovered* in jury trials. The availability of the constitutional guarantee and its Code companion relating to District Court jurisdiction, is obviously dependent not on the size of the verdict, but on "the amount in controversy." (Here, that amount was substantially in excess of $500.)

The jurisdictional statutes extant prior to the advent of the District Court varied from county to county; however, they were generally perceived to have been one hundred dollars. Md. Code (1972 Replacement Vol.) Art. 52, Sec. 6.

> "If the sum *claimed* in actions for redress for

wrongs, or *recovered* in actions for the enforcement of contracts, *exceeds* one hundred dollars, justices of the peace have no jurisdiction. . . .

As a necessary extension of this doctrine it appears that where a people's court has exclusive jurisdiction of matters in excess of this amount, the law courts of Baltimore City and the circuit courts of the particular county are likewise without jurisdiction in any amount below the limit of exclusive jurisdiction in the inferior court. If the verdict shall be below the jurisdiction of the court and a *non pros* accordingly entered, the record is a bar to any action founded upon the same cause of action in any court the limit of whose jurisdiction is greater than the amount of the verdict; but the amount of the verdict, less any costs assessed against the plaintiff, constitutes a debt due by the defendant and is recoverable in any court (such as a people's court) or before any justice of the peace having jurisdiction to that amount." (Citing by footnote Md. Rule 653). 1 *Poe's Pleading and Practice*, Sixth Ed., Sec. 40.

Appellees here directed us to *Associates Discount v. Hillary*, 262 Md. 570, 583 where Judge Barnes for the Court of Appeals applied Md. Rule 653 to a verdict of $19.91 and remanded the case for entry of judgment of non-pros presupposed by the rule, "inasmuch as such verdict is below the jurisdictional amount of the Circuit Court for Anne Arundel County." It seems apparent there, although left unsaid, that Judge Barnes alluded to then Md. Code, Art. 52, Sec. 12 which set forth exclusive monetary jurisdictional limits for each of the counties' then justices of the peace and people's courts, wherein:

" . . . the jurisdiction of the judges of the people's court shall be exclusive in civil cases involving amounts not exceeding $300.00."

That statute was in full force and effect on June 25, 1971 when *Associates Discount v. Hillary, supra*, was decided,

and was not repealed until the creation of the District Court in 1972.

With the advent of the District Courts, exclusive jurisdiction was given them over tort cases:

" . . . if the . . . damages claimed do not exceed $5000." Cts. Art., Sec. 4-401.[13]

In addition to substantially having increased the monetary jurisdiction for the newly created District Court, the Legislature significantly clarified its "exclusive original jurisdiction" as being determined by the "damages claimed."

*Associates Discount, supra,* would thus seem inapposite on its face to the present case. It related to entry of a non-pros judgment where the "verdict" of a jury was "below the jurisdiction of the court." Since jurisdiction under the new District Court system is, by definition, a matter of claim rather than a matter of verdict, a non-pros does not appear appropriate by virtue of any existing jurisdictional statute. The trial judge here was seemingly misled by the exception to the District Court's general monetary jurisdiction contained in Cts. Art., Sec. 4-402 (e) (1) which reiterates in jurisdictional context the constitutional right to a jury trial for amounts in controversy in excess of $500.

We conclude that application of the rule to contemporary courts may very well be an anomaly, phrased as it is almost as its progenitor was originally enacted by the Laws of Maryland, 1888, Ch. 366. Nor are we persuaded that its current utility was affirmed by the Rules Committee when it was amended to substitute "District Court" for "Peoples Court" as that transition became imminent. Such amendment may have resulted from a word search by a computer in the housecleaning of the Code.

> *Judgments reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid one-half by appellants and one-half by appellees.*

---

13. Appellants' $25,000 claim put them well without the District Court exclusive range.