Mitri S. HABASH, et al., Plaintiffs,

v.

CITY OF SALISBURY, MARYLAND, et al., Defendants.

Civil No. L–04–2338.

United States District Court, D. Maryland.

May 26, 2009.

---

Michael D.J. Eisenberg, Law Office of Michael D.J. Eisenberg, Carolyn Elefant, Law Offices of Carolyn Elefant, Washington, D.C., for Plaintiffs.

Daniel Karp, Karpinski Colaresi and Karp PA, Baltimore, MD, William Robinson Hall, Wicomico County Board of License Commissioners, Salisbury, MD, David Randolph Thompson, Cowdrey Thompson and Karsten P.C., Easton, MD, for Defendants.

### MEMORANDUM

BENSON EVERETT LEGG, Chief Judge.

This is the second of two civil rights cases filed in this Court involving defunct nightclubs once located in Salisbury, Maryland. The Plaintiff in the instant case, Mitri Habash, owned a nightclub named Club Vissage. He currently alleges that

Defendants [1] purposefully drove his establishment out of business because Club Vissage catered to a black clientele on its hip-hop nights. Following extensive discovery, Defendants moved for summary judgment. After the motion was fully briefed, the Court heard oral argument. For the reasons stated herein, Defendants' motions for summary judgment are GRANTED.

As mentioned, the present dispute is the companion to an earlier case filed in this Court. *See Orgain v. City of Salisbury, et al.*, 521 F.Supp.2d 465 (D.Md.2007). In that case, the Court granted the defendants' motion for summary judgment. *See id.* at 469. The Fourth Circuit Court of Appeals affirmed the decision on appeal. *See Orgain v. City of Salisbury, et al.*, 305 Fed.Appx. 90, 97–98 (4th Cir.2008). Because the earlier case overlaps both legally and factually with the instant dispute, an extended discussion of the *Orgain* case is warranted.

The lead plaintiffs in the first case, Robert and Rebecca Orgain, owned a large nightclub named Club Andromeda. The club was open at least four nights a week and, initially, each night had a different theme. Wednesday, which was ladies night/hip-hop night, proved to be the most popular and drew a crowd that was predominantly, though not exclusively, black. Because of this popularity, the Orgains added a second night of hip-hop on Saturdays.

Club Andromeda, on hip-hop nights, became a trouble spot for the Salisbury Police Department ("SPD"). The department received dozens of Calls for Service ("CFS"). Some calls were for petty offenses such as vandalism, but many others were for more serious crimes such as assaults, thefts, disorderly conduct, robberies, and shootings. Eventually, after the Orgains proved unsuccessful in reducing the level of violence at Andromeda, the Wicomico County Board of License Commissioners ("County Liquor Board" or "the Board") suspended the Orgains's liquor license for thirty-five days. This suspension tipped the club's already precarious financial balance and the Orgains shuttered Andromeda. Shortly thereafter, they brought a civil rights suit against a number of defendants, including the City of Salisbury, its police chief, Allan J. Webster, and three members of the County Liquor Board.

The complaint's core allegation asserted that the defendants purposefully drove the nightclub out of business because hip-hop nights attracted a predominantly black clientele. The complaint's principal legal theory posited that the defendants, by treating Andromeda less favorably than other similarly situated nightclubs on account of the race of the club's clientele, had violated the Orgains's rights under the Equal Protection Clause of the Fourteenth Amendment.

With respect to the police defendants, the alleged less favorable treatment included threats to prosecute the Orgains for maintaining a public nuisance, failing to offer the Orgains assistance from the department's community affairs section, and imposing an oppressive, heavy-handed police presence at Andromeda on hip-hop nights. With respect to the County Liquor Board defendants, the alleged less

---

**1.** The specific Defendants in this case are: (1) the City of Salisbury, Maryland, (2) Salisbury Chief of Police Allan J. Webster, (3) Salisbury Police Officer Aaron B. Hudson; (4) Wicomico County, Maryland, (5) Wicomico County Board of License Commissioners, (6) Leo McNeil, W.C. Holloway, and Shirley C. Gray, the Chairman and members of the Board of License Commissioners, and (7) Greg Rickards, Chief Inspector for the Board of License Commissioners.

favorable treatment included imposing an unreasonably harsh sanction—the thirty-five day suspension—on the Orgains.

In a lengthy written opinion, this Court granted summary judgment to the defendants, ruling that the Orgains had failed to "produce evidence from which a fair-minded jury could find that the laws were selectively enforced against them." *Orgain*, 521 F.Supp.2d at 469. In a per curiam opinion, the Fourth Circuit Court of Appeals affirmed. *See Orgain*, 305 Fed. Appx. at 97–98. These two opinions are central to an understanding of the instant case. The *Orgain* opinions lay out the applicable legal analysis and discuss facts—including facts about Club Vissage—that are pertinent to Habash's claims.

 As explained by the Fourth Circuit, the Equal Protection Clause prohibits officials from applying facially neutral laws and policies in an intentionally racially discriminatory manner. *See Orgain*, 305 Fed.Appx. at 97–98. At the summary judgment stage, a plaintiff is required to proffer sufficient evidence from which a reasonable jury could find that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. *See Orgain*, 521 F.Supp.2d at 477. In *Orgain*, the defendants were entitled to summary judgment because the plaintiffs failed to produce evidence from which a fair-minded jury could find either that Andromeda was treated differently from similarly situated clubs or that defendants were motivated by racial animus. *Id.* at 469.

Like the Orgains, Habash has failed to produce sufficient evidence from which a set of fair-minded jurors could determine that the laws were selectively enforced against him. The Court will, therefore, in a separate Order (1) GRANT Defendants'

motions for summary judgment, (2) ENTER JUDGMENT in their favor, and (3) DIRECT the Clerk to close the case.

## I. FACTUAL BACKGROUND

### A. Club Vissage

In September 2000, Habash purchased a Salisbury nightclub formerly known as the Firehouse. After making some minor renovations, Habash re-opened the space under the name Club Vissage. Vissage was open Wednesday through Saturday evenings. In an effort to attract more customers, Habash instituted various "theme nights." These included "college night," "all you can drink night," and "hip-hop night." Hip-hop night proved to be a success and Habash expanded it to include both Friday and Saturday evenings.

### B. Interactions Between Habash and the Salisbury Police Department

It is undisputed that Vissage, on hip-hop nights, became a trouble spot for the SPD. Although the record is less developed on this point than it was in *Orgain*, both sides agree that fist fights frequently broke out, necessitating frequent Calls for Service. Distressed by the violence, Habash requested a meeting with Chief Webster to discuss his concern that the police were not responding to Vissage's calls quickly enough. He also wanted Chief Webster's advice regarding ways of reducing violence at the Club.

The meeting took place on January 17, 2003. Chief Webster assured Habash that the SPD was doing everything in its power to respond to Vissage's calls as quickly as possible. When the conversation turned to ways to reduce the number of violent incidents, Chief Webster offered several suggestions. He suggested that Habash call 911 at the first sign of trouble. He also proposed that Habash tighten Vissage's

dress code. Finally, because the violence centered on hip-hop nights, Webster suggested that the Club change its music format to country and western on Fridays and Saturdays.

After the meeting, Habash tried tightening the dress code, shutting off the music earlier in the evening, and calling 911 at the first sign of trouble. These measures did not stem the trouble. Vissage's violence-related Calls for Service not only persisted but escalated, with the Club reporting two incidents of shots being fired.

On February 21, 2003, Salisbury Police Officer Elmer Davis sent Habash a warning letter. He noted that problems at Vissage were increasing, and he advised Habash that the Department "would meet with ... [the] State's Attorney regarding any action that could be undertaken." Officer Davis ended the letter with a request for a face-to-face meeting with Habash. At that meeting, Habash asked Davis for his advice on how to address Vissage's problems. Among other ideas, Officer Davis suggested that Habash change the format of hip-hop nights.

A week later, Habash had a second meeting with Chief Webster. Webster made it clear that he would not tolerate the continued violence at Vissage. During the discussion, he repeated his change of format suggestion. According to Habash, Webster threatened him with a criminal prosecution if he renewed his liquor license. Webster denies making such a threat. At this summary judgment stage, the Court will accept Habash's version as being true.

## C. Interactions Between Habash and the Wicomico County Board of License Commissioners

As discussed in *Orgain,* the City of Salisbury is located in Wicomico County, Maryland. Liquor licenses in the County fall within the jurisdiction of the County Liquor Board, which employs its own enforcement personnel. At all pertinent times, the members of the Board included Leo McNeil, W.C. Holloway, and Shirley C. Gray. In March 2002, the Board issued a regulation that, *inter alia,* prohibited certain drink incentive programs that encourage heavy drinking. The banned programs included "all you can drink" and "beat the clock" specials. The former program is self explanatory. The latter entitles patrons who arrive early to pay less per drink throughout the evening. On deposition, Habash testified that the regulation only affected Andromeda and Vissage because they were the only two clubs offering these specials.

The Board's new regulation also required drinks to be sold at market rates, but did not specify a minimum price. Interpreting the regulation, Greg Rickards, Chief Inspector for the County Liquor Board, advised Habash that he was not permitted to sell beer or other alcoholic drinks for less than $1.00. Habash objected on the ground that he could make a profit selling certain cheaper brands of beer for less than $1.00. Habash does not allege that other establishments were permitted to sell drinks for less than $1.00. He contends, however, that Vissage was the only club selling beer at that low price.

Habash further contends that in March 2003, Rickards said that the Board would initiate a show cause hearing if Habash sought to renew Vissage's liquor license. A show cause hearing is not a prosecution. Instead, it is an administrative hearing at which the license holder must show cause why his license should be renewed. The Board's briefs do not take a position with respect to this allegation except to state that Rickards did not have the authority to make such a decision. On summary judgment, the Court will assume that Rickards

did make the statement, as Habash alleges.

During his depositions in *Orgain* and in the instant case, Habash offered a number of explanations for his decision to surrender his liquor license and close Vissage. He said the Club was losing money due to the violence on its premises; he stated that the frequent fights during hip-hop nights had given Vissage a bad reputation, scaring away trade—primarily college students—on other nights; he pointed to the Board's ban on certain drink specials, which made it harder to attract customers; and he acknowledged that efforts to quell the violence had proven unsuccessful, and that he did not want to face possible criminal prosecution. Weighing all of those factors, Habash decided the best course of action was to surrender his liquor license and close Vissage.

### D. Statements Made by Officer Hudson

In addition to focusing on Defendants' allegedly unconstitutional actions to close Vissage, Habash's complaint also asserts a pendant state law claim for defamation. The claim centers on Habash's relationship with David Nettles, who is a teacher's assistant and football coach at Wicomico High School. Nettles had worked part-time from October 2000 to October 2001 providing security at Vissage. Sometime prior to May 2004, Nettles purchased protein supplements for his team from Habash.

In May 2004, Salisbury Police Officer Aaron B. Hudson asked Nettles whether he had heard that Habash had been arrested on drug and gun charges in Delaware. A fellow police officer—Rusty Savage—had informed Hudson that Habash had been arrested on those charges, and Hudson called Nettles in an attempt to determine whether the report was accurate or not. Hudson eventually learned that Habash had been arrested in Delaware, but the arrest was for a gun offense, not a drug offense. Habash alleges that Nettles stopped purchasing protein supplements from him following the inquiry from Officer Hudson. He contends that Hudson's statement was defamatory, and has sued Hudson, the SPD, and the City of Salisbury.

### E. The Instant Litigation

On July 21, 2004, Habash filed the instant suit. The complaint includes five counts:

Count 1 (42 U.S.C. 1983): Habash alleges that all of the Defendants violated his equal protection rights by selectively enforcing city and county laws against Club Vissage because of the race of the Club's patrons.

Count 2 (42 U.S.C. 1983): Habash alleges that all of the Defendants violated his first amendment right to free speech by threatening adverse action unless he stopped playing hip-hop music at Club Vissage.

Count 3 (42 U.S.C. § 1981): Habash alleges that all of the Defendants, by their illegal actions, prevented him from making and enforcing contracts with his black clientele.

Count 4 (42 U.S.C.1985(3)): Habash alleges that the Defendants, inspired by racial animus, conspired to deprive him of the equal enjoyment of rights secured by law.

Count 5 (state law defamation): Habash alleges that Officer Hudson, the City of Salisbury and the SPD defamed him when Hudson suggested that Habash may have been arrested on drug charges.

## II. STANDARD OF REVIEW

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). "In resolving a motion for summary judgment, the evidence presented must always be taken in the light most favorable to the non-moving party." *Orgain*, 305 Fed. Appx. at 97. Still, "neither unsupported speculation, nor evidence that is merely colorable or not significantly probative will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered." *Id.* (internal citation and quotation marks omitted).

## III. ANALYSIS

### A. Legal Standards

As the following section demonstrates, Habash's proof falls short because he is unable to satisfy one or more of the required elements for each count. The relevant legal standards for each of Habash's counts are as follows:

#### 1. 42 U.S.C. § 1983—Selective Enforcement

■ In order to prevail on a Fourteenth Amendment selective enforcement claim, a plaintiff must show (i) that he was treated differently than a similarly situated individual, (ii) for an impermissible consideration such as race. *See Orgain*, 521 F.Supp.2d at 477.

#### 2. 42 U.S.C. § 1983—Violations of First Amendment Rights of Speech

■ In order to successfully bring a First Amendment claim under Section 1983, a plaintiff must establish three elements: (i) that the plaintiff's speech was protected, (ii) that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech, and (iii) that a causal relationship exists between its speech and the defendant's retaliatory action. *See Cottom v. Town of Seven Devils*, 2001 WL 1019410, at *8, 2001 U.S. Dist. LEXIS 7888, at *28 (W.D.N.C. June 13, 2001).

#### 3. 42 U.S.C. § 1981

■ A Section 1981 claim is comprised of three elements. First, that the plaintiff is a member of a racial minority. Second, that the defendant acted with an intent to discriminate against the plaintiff on the basis of race. And, third, that the defendant's race discrimination concerned plaintiff's "making, performance, modification, and termination of contracts" or the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *See Orgain*, 521 F.Supp.2d at 498 (quoting *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996)).

#### 4. 42 U.S.C. § 1985

■ To succeed on a § 1985(3) claim, a plaintiff must prove: (i) a conspiracy of two or more persons, (ii) who are motivated by a specific class-based, invidiously discriminatory animus to (iii) deprive the plaintiff of the equal enjoyment of rights

secured by the law to all, (iv) and which results in injury to the plaintiff as (v) a consequence of an overt act committed by the defendants in connection with the conspiracy. *See Olukayode v. Baltimore County*, 450 F.Supp.2d 610, 618 (D.Md. 2006). In addition, "a claimant must show an agreement or a 'meeting of the minds' by defendants to violate [his] constitutional rights." *Id.*

### 5. Defamation

■ Under Maryland law, a defamation plaintiff must show: (i) that the defendant made a defamatory communication, (ii) that the statement was false, (iii) that the defendant was at fault in communicating the statement, and (iv) that the plaintiff suffered harm. *See Shapiro v. Massengill*, 105 Md.App. 743, 661 A.2d 202, 216–17 (Md.Ct.Spec.App.1995). Moreover, "[t]he type of malice required for ... private person ... defamation actions is knowledge of falsity or reckless disregard for the truth." *Globe Sec. Sys. Co. v. Sterling*, 79 Md.App. 303, 556 A.2d 731, 735 (Md.Ct. Spec.App.1989).

### B. Count 1 (42 U.S.C. § 1983—Selective Enforcement), Count 3 (42 U.S.C. § 1981), and Count 4 (42 U.S.C. § 1985).

■ The Court will address these three counts as a group because they include a common element, namely the requirement that Habash prove that each of the named defendants' conduct was motivated by racial animus. Habash's proof on this point is thin to the vanishing point. The first defendants to be considered are the County Liquor Board; its three Board members, Leo McNeil, W.C. Holloway, and Shirley C. Gray; and Board employee Gregory Rickards. Habash's evidence of racial bias consists of the following allegations: there is racial tension in Salisbury,

Maryland, there is a history of racial discrimination in the United States and the eastern shore of Maryland, Club Vissage's clientele on hip-hop nights is predominantly black, the Board banned two drink specials being offered by two hip-hop clubs (Vissage and Andromeda), a Board employee (Rickards) told Habash that Vissage could not sell drinks for less than $1.00, and Rickards told Habash that he would be required to show cause at a hearing in order to renew his liquor license.

None of this evidence, whether considered singly or collectively, could persuade a fair-minded jury that the Board, its members, or Inspector Rickards are bigoted. Habash's argument is based on the false syllogism that the Board's actions hampered a club whose clientele was black, ergo the Board's actions must have been motivated by race. This syllogism cannot substitute for the type of solid proof required to withstand a motion for summary judgment.

Other evidence in the record underscores the flimsiness of Habash's case. For example, the Liquor Board's Chairman, Leo McNeil is himself black. As the Fourth Circuit observed in Orgain, "[b]y noting this fact, the district court was apparently relying upon the common sense notion that, as a member of the same race as the predominant number of Andromeda's customers on hip-hop nights, Liquor Board Commissioner Leo McNeil likely did not take the race of such customers into account...." *Orgain*, 305 Fed.Appx. at 103.

On deposition, the Board members testified that their only consideration in enacting the regulations was to identify and ban those drink incentives that encouraged drunkenness and disorder. As a matter of common sense, specials such as "all you can drink" and "beat the clock," and the

selling of cheap drinks all promote excessive drinking. Habash offers no evidence that undercuts the Commissioners' testimony as to their motives.

Moreover, Habash never challenged the Board's drink-special regulations, which applied county-wide, or contended to the Board that the regulations disproportionately impacted hip-hop establishments. As a result, the Board was never given an opportunity to consider the impact of the facially neutral regulations on Vissage.

■■■ With respect to Rickards, Habash alleges that the Inspector was known to have made derogatory statements against blacks. This allegation is based solely on inadmissible hearsay. Habash fails to identify any racially derogatory statement or any specific individual to whom Rickard made such a statement. This means that Habash's case against Rickard is based solely on Rickard's refusal to allow Habash to sell drinks for under $1.00 and his statement that Habash would be subject to a show cause hearing if he attempted to renew Vissage's liquor license. With respect to the second statement, Rickard was not threatening a criminal prosecution if Habash attempted to renew. Instead, Rickard was merely advising that Habash would be required to show cause why his license should be renewed despite the problems at Vissage. The Board and not Rickard would make the ultimate decision. With respect to the first statement, Rickard testified that he does not offer advice to clubs and further denies that he ever communicated price floors or limits for beverage sales.

Accordingly, the Board, the Board Members and Inspector Rickard are entitled to summary judgment as to Counts 1, 3, and 4.[2] The Court will now turn to the evidence against the City of Salisbury, the SPD, and Chief Webster.

Habash offers the following evidence against the City defendants: There is racial tension in Salisbury; there is a history of racial discrimination in the United States, including Maryland's eastern shore; the SPD was slow to respond to Calls for Service from Vissage; Chief Webster and Officer Davis suggested that Vissage change its entertainment format on Fridays and Saturdays from hip-hop to country and western; and Chief Webster allegedly threatened Habash with a criminal prosecution if he sought to renew Vissage's liquor license.

■■■ With respect to the first two points, Habash offered reports from his expert witness, Jose J. Barrera, PH.D., a former professor of ethnic studies at the University of Colorado, Colorado Springs. Barrera's report purports to apply a so-called Theory of Prejudice to the case. In his final report dated July 15, 2008, Barrera explains the Theory of Prejudice as follows:

[W]e can understand the context of behavior in term of Gordon Allport's Five Stages of Prejudice, first published in 1954 but still in use today. Allport's five-point scale describes in increasingly higher levels of prejudicial attitudes leading to discriminatory behavior. The five stages of prejudice according to Allport are: 1) Anti–Locution; 2) Avoidance or Shunning; 3) Discrimination; 4)

---

**2.** Similarly, Wicomico County is entitled to summary judgment with respect to Counts 1, 3, and 4. *See Int'l Ground Transp. v. Mayor and City Council of Ocean City, Md.,* 475 F.3d 214, 219 (4th Cir.2007) (holding that "a municipality may not be found liable for a constitutional violation in the absence of an unconstitutional act on the part of at least one individual municipal actor"). This same analysis applies to each of the claims brought against either Wicomico County or the City of Salisbury.

Individual physical attacks; and 5) Collective actions or state-sponsored attacks, lynchings, pogroms, ethnic cleansing, mass exterminations, etc.

Applying the so-called Theory of Prejudice to his interpretation of the case, Professor Barrera reached the following conclusion:

The Habash case in Salisbury exemplifies a fundamental racial ambivalence, denial about this, the inevitable guilt, but followed by subtle aggression and direct discrimination. While there seems to be a rejection of the most blatant overt forms of discrimination against Mr. Habash and his business, it cannot be doubted that there is a deep-rooted opposition to racial change in this community. Anything which is perceived as changing the racial balance, the racial status quo, is seen as a threat, however vaguely or incoherently that threat of change is perceived.

Professor Barrera's views about the case, including his perceptions of "gangsta rap," "anti-working class prejudice," and the pernicious aspects of "modern pop culture," while interesting, are wholly irrelevant. The law does not permit an expert, even a sociology professor with a doctoral degree, to interpret the facts of a case and express an opinion that the defendants are guilty of bigotry.

Thus, the case against the City Defendants stands solely on the allegations concerning the SPD's response times, the suggestions that Vissage change its format, and Chief Webster's alleged threat to prosecute. We shall address these points seriatim.

With respect to the response times, Habash could have offered three types of proof: (1) specific examples of instances when the SPD failed to respond to a Call for Service, (2) evidence that Chief Webster or the SPD directed or encouraged its personnel to either ignore or respond tardily to Vissage's Calls for Service, or (3) an analysis of the CFS records establishing that the SPD responded more quickly to similarly situated night clubs with a predominantly white clientele, or Club Vissage on a non-hip-hop night.

Both sides conducted extensive discovery, which included access to SPD CFS records for Andromeda, Vissage, and at least one country and western themed nightclub, Brew River, with a predominantly white clientele. Despite this discovery, Habash offered no direct evidence that the SPD was slow to respond to Vissage. Habash also offered no comparison between the response times for Andromeda, Vissage, or Brew River. On the other side of the ledger, Chief Webster testified that the SPD responded to Vissage's CFS at the same rate as it did for all Salisbury establishments. Accordingly, Habash has offered no competent proof that the SPD was slow to respond.[3]

With respect to the second and third allegations, Chief Webster testified that he suggested a change in theme because the violence at Vissage occurred predominantly on hip-hop nights. Similar violence was seen neither at the country and western themed Brew River nor on non-hip-hop nights at Vissage.[4] It would be

3. It bears mentioning that the Orgains faulted the SPD for maintaining a heavy-handed presence at Club Andromeda and ignoring violence at other Salisbury establishments; the exact opposite of what is now claimed by Habash in the instant litigation.

4. In *Orgain,* the plaintiffs attempted to show that Brew River was a similarly situated institution with respect to CFS but neither was threatened with closure nor had its license suspended. In its opinion, the Fourth Circuit carefully analyzed the similarities between

sheer speculation to suggest that race was a motivating factor for Chief Webster's actions. As mentioned, the facts and evidence in *Orgain* and the instant case overlap substantially. In its opinion in *Orgain*, the Fourth Circuit discussed the Orgain's contention that Chief Webster's suggestion that Andromeda change themes and his threat to prosecute if Andromeda did not reduce the level of violence evidenced racial bias. Specifically, the court rejected the Orgain's argument and held that Chief Webster's actions "were solely in response to [his] genuine concern for public safety." *Orgain*, 305 Fed.Appx. at 101. Similarly, in this case, no fair-minded jury could find that Chief Webster's behavior was motivated by racial bias. Accordingly, counts one, three, and four must be dismissed as to all Defendants.

### C. Count 2 (42 U.S.C. § 1983—Abridgement of Free Speech Rights)

■ Habash's second Count asserts that Defendants violated the First Amendment by threatening criminal prosecution and/or adverse administrative action—*e.g.* a show cause hearing—if Habash did not change Vissage's format on hip-hop nights.[5] As noted earlier, a Section 1983 First Amendment plaintiff must prove: (i) that his speech was protected, (ii) that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech, and (iii) that a causal relationship exists between his speech and the defendant's retaliatory action. *See Cottom v. Town of Seven Devils*, 2001 WL 1019410, at *8, 2001 U.S. Dist. LEXIS 7888, at *28 (W.D.N.C. June 13, 2001).

Because Habash has failed to establish those three elements, this claim must be dismissed.

First, Habash has failed to establish that he engaged in protected speech. Specifically, he fails to point the Court towards any case supporting the proposition that the playing of hip-hop music constitutes protected speech. Further, even if Club Vissage's musical format could be construed as protected speech, Habash's claim must fail. Habash bears the burden of proving that a causal relationship exists between his speech and Defendants' allegedly retaliatory actions. *See Cottom*, 2001 WL 1019410 at *8, 2001 U.S. Dist. LEXIS 7888 at *28. Given the admitted level of violence on Club Vissage's hip-hop nights, no fair-minded jury could conclude that either Chief Webster or Inspector Rickards acted in retaliation for Habash's speech. *See Orgain*, 305 Fed.Appx. at 101 (holding that Salisbury officials were acting out of a "genuine concern for public safety"). The lack of a casual connection between Habash's speech and Defendants' actions dictates that this claim be dismissed.

### D. Count 5 (Defamation)

■ Finally, Count 5 presents a state law defamation claim against Officer Hudson, the Salisbury Police Department, and the City of Salisbury. In short, Habash alleges that Officer Hudson defamed him by telling David Nettles that Habash had been arrested on drug charges. To review, a defamation plaintiff must show: (i) that the defendant made a defamatory communication, (ii) that the statement was

---

Brew River and Club Andromeda, and concluded that the two were not similarly situated. That conclusion was premised on the fact that Andromeda's hip-hop nights "presented a greater threat to public safety than ... any night of the week at Brew River." *See* 305 Fed.Appx. at 100. As in *Orgain*, the lack of

comparators here is fatal to Habash's selective enforcement claim.

5. While this Count does not clarify which Defendants allegedly made these threats, the facts of the Complaint suggest that it was Chief Webster and/or Inspector Rickards.

false, (iii) that the defendant was at fault in communicating the statement, and (iv) that the plaintiff suffered harm[6]. *See Shapiro v. Massengill*, 105 Md.App. 743, 661 A.2d 202, 216–17 (Md.Ct.Spec.App.1995). Moreover, "[t]he type of malice required for … private person … defamation actions is knowledge of falsity or reckless disregard for the truth." *Globe Sec. Sys. Co. v. Sterling*, 79 Md.App. 303, 556 A.2d 731, 735 (Md.Ct.Spec.App.1989).

Here, no reasonable jury could find that Officer Hudson either possessed knowledge of falsity or acted with reckless disregard for the truth. The summary judgment record indicates that Officer Hudson spoke to Nettles only after being informed by another police officer that Habash had been arrested for a drug crime. The other officer's statement demonstrates that Officer Hudson had a good faith belief that Habash had been arrested on drug charges. Furthermore, he was acting under that good faith belief when speaking with Nettles. Consequently, the defamation claim against Officer Hudson must be dismissed. Because there is no basis for a claim against Officer Hudson, the claims against the City of Salisbury and Salisbury Police Department must be dismissed as well.

## IV. CONCLUSION

For the foregoing reasons, the Court will, by separate Order: (1) GRANT Defendants' motions for summary judgment, (2) ENTER JUDGMENT in their favor, and (3) DIRECT the Clerk to close the case.

---

**6.** In this case, it is arguable that Habash need not prove that he suffered harm in order to prevail on his defamation claim. *See Cheek v. J.B.G. Properties, Inc.* 344 A.2d 180 (Md.Ct. Spec.App.1975) (holding that damages need not be proven where the alleged defamation is the imputation of a crime).