**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-1698**

ROBERT ORGAIN; REBECCA ORGAIN; M31 ANDROMEDA ENTERTAINMENT,
LLC,

Plaintiffs – Appellants,

v.

CITY OF SALISBURY, MARYLAND, a Maryland municipal
corporation; CHIEF OF POLICE ALLAN J. WEBSTER, in his
individual and official capacity; WICOMICO COUNTY,
MARYLAND, a Maryland corporate body; LEO MCNEIL, in his
individual and official capacity as Board Member of the
Wicomico County Board of License Commissioners; W.C.
HOLLOWAY, in his individual and official capacity as Board
Member of the Wicomico County Board of License
Commissioners; SHIRLEY C. GRAY, in her individual and
official capacity as Board Member of the Wicomico County
Board of License Commissioners,

Defendants – Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Benson Everett Legg, Chief District
Judge. (1:02-cv-02797-BEL)

Argued: October 30, 2008          Decided: December 29, 2008

Before TRAXLER and SHEDD, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Carolyn Elefant, Washington, D.C., for Appellants. Daniel Karp, KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland; David Randolph Thompson, COWDREY, THOMPSON & KARSTEN, P.A., Easton, Maryland, for Appellees. **ON BRIEF**: Victoria M. Shearer, KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this civil rights action alleging violations of the Fourteenth Amendment's Equal Protection Clause and Title 42 U.S.C. § 1981, plaintiffs Robert Orgain, Rebecca Orgain, and M31 Andromeda Entertainment, LLC (collectively Plaintiffs) appeal from the district court's grant of summary judgment adverse to them. Plaintiffs' claims are based upon their core allegation that the City of Salisbury, Maryland, its police chief (in his individual and official capacities), and the three members of Wicomico County's Board of License Commissioners (in their individual and official capacities), drove their nightclub out of business, because it hosted nights with a hip-hop music format that attracted a predominantly black clientele.

For reasons that follow, we affirm.


I.

On October 25, 2000, Robert and Rebecca Orgain (the Orgains), through M31 Andromeda Entertainment, LLC, opened a 13,000 square-foot, 750-person occupancy-limit nightclub, named Andromeda, in Salisbury, Maryland.[1] Salisbury is the county seat

---

[1] Because this is an appeal from the grant of summary judgment, we set forth the facts, based upon the evidence, viewed in the light most favorable to Plaintiffs. Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (en banc).

of Wicomico County, Maryland. Andromeda's profits derived primarily from the sale of alcoholic beverages to its customers, pursuant to a Class D liquor license issued to the Orgains by Wicomico County's Board of License Commissioners (the Liquor Board). The Orgains' Class D liquor license limited them to admitting customers who were at least twenty-one years old.

Andromeda operated at least four nights per week and offered both live bands and disc jockeys, with each night having a different theme. Hip-hop nights at Andromeda, initially held only on Wednesday nights, proved to be the most popular and drew a predominantly black clientele. At some later point in time, Saturday nights also became hip-hop nights at Andromeda.

Unfortunately, Andromeda soon became a trouble spot for the Salisbury Police Department (the SPD). By August 10, 2001, the SPD had received fifty-eight Calls for Service concerning incidents at or near Andromeda.[2] Some Calls for Service were for petty offenses such as vandalism. Many others, however, were for more serious crimes such as assaults, thefts, disorderly conduct, and shootings.

---

[2] According to the SPD's website, a Call for Service is "an event occurring in or near the City of Salisbury to which one or more Salisbury Police employees must respond to evaluate or take action, or an event that comes to the attention of police or is initiated by police that requires formal documentation (an offense report, supplemental report, or accident report)." Definition of "Call for Service," http://www.salisburypd.com/ FAQ/faq.html (as of June 5, 2007).

Andromeda's first shooting incident occurred at approximately 2:30 a.m., on a Wednesday hip-hop night. Specifically, at approximately 2:30 a.m., on Thursday, August 9, 2001, a fight took place near the vehicle of an Andromeda customer parked in Andromeda's parking lot, resulting in a gun being fired at the customer's vehicle. The shooting left a bullet hole in the rear hatch of the customer's vehicle and a bullet in its passenger compartment.

Salisbury Police Chief Allan Webster (Chief Webster) promptly followed-up by sending Robert Orgain the following letter, on August 10, 2001:

Dear Mr. Orgain:

According to the crime statistics compiled by the Salisbury Police Department, your business establishment known as Andromeda has generated fifty-eight (58) calls for service since October 25, 2000. The nature of the calls run from weapons possession to traffic accidents. Of the fifty-eight (58) calls, twenty-six (26) of those calls are violence related.

On August 9, 2001, the Salisbury Police Department again responded to a large altercation at your business. The repeated calls associated with violence cause me great concern, not only to the safety of your patrons, but to the officers of the Salisbury Police Department. These calls cause a burden to our resources that ultimately affect our policing efforts throughout the City.

Please review your internal policies concerning alcohol consumption and security to assist us in decreasing the incidents at the Andromeda. Should the violence related calls continue, I will discuss the issue with Mr. Davis Ruark, State's Attorney for Wicomico County, to explore violations of the nuisance law.

- 5 -

(J.A. 810).  Chief Webster copied the Liquor Board, State's Attorney Davis Ruark, and Salisbury Mayor Barrie Tilghman on the letter.

After the Liquor Board received its copy of Chief Webster's letter to Robert Orgain, the Liquor Board sent its own warning letter to the Orgains on August 15, 2001, stating the following:

> The Wicomico County Board of License Commissioners received a copy of a letter, dated August 10, 2001, sent to you from Chief Allan Webster, Salisbury Police Department.  This letter stated that there have been 58 calls for police service since October [2]5, 2000 at your nightclub, 26 of which were violence related.  The policy of this Board is that you, as a licensee, must maintain peace and safety for your patrons at all times.  Alcoholic beverage licenses are issued for the convenience of the public.
>
> This is to notify you that, should this type of activity continue at your licensed premise, a show-cause order will be issued against you and your license may be suspended or revoked as a result of the hearing.  Please make a more diligent effort to control alcohol consumption and provide safety for your patrons.

(J.A. 815).

Robert Orgain responded to the Liquor Board by letter dated August 20, 2001, in which letter he denied ever having received Chief Webster's letter; took issue with the Calls for Service statistics cited by the Liquor Board; stated that he had drafted correspondence to Chief Webster requesting copies of the police reports supporting such statistics; stated that recent (but unspecified) management changes at Andromeda had been

- 6 -

implemented; and stated that he would keep the Liquor Board advised. Robert Orgain copied Chief Webster, State's Attorney Davis Ruark, and Salisbury Mayor Barrie Tilghman on his letter.

Despite whatever positive management changes may have taken place at Andromeda, on November 9, 2001, the Wicomico County Alcohol Task Force discovered five underage drinkers at Andromeda, each who had gained entrance to Andromeda by using a false driver's license. Additionally, all five underage drinkers failed breathalyzer tests.

After the Task Force officers cited the Orgains for five counts of allowing an underage person to be on the premises, and five counts of serving alcohol to an underage person, the Liquor Board issued the Orgains a show-cause order to appear for a hearing on the charges on December 13, 2001. Four days after such hearing, at which hearing the Liquor Board heard live testimony and the Orgains were represented by counsel, the Liquor Board found the Orgains guilty of ten violations of Maryland's liquor laws, fined them $5,000.00, and suspended their liquor license for five days. Although the Orgains initially noted an appeal of the suspension to state court, they later withdrew such appeal and served their suspension in mid-January 2002.

Notably, the Orgains served their liquor license suspension after two more shooting incidents occurred on hip-hop nights at

Andromeda.  On Wednesday, January 2, 2002, at 11:38 p.m., a complainant advised the SPD, via a Call for Service, of shots fired in Andromeda's parking lot.  On Thursday, January 10, 2002, at 2:30 a.m., a complainant advised the SPD, via a Call for Service, "THAT A GUN SHOT HAS GONE OFF IN THE BAR.  ONE EMPLOYEE WAS STRUCK OVER THE HEAD WITH A BOTTLE AND TRANSPORTED TO [the hospital]."  (J.A. 1078).

The day after this latest shooting incident, Chief Webster, via hand-delivery by an SPD officer, sent Robert Orgain the following letter:

Dear Mr. Orgain:

In August of 2001, I sent you a letter concerning calls for service at the Andromeda Nightclub.  Of the fifty-eight calls, almost half were of a violent nature.  I asked you to take steps to reduce these incidents in the hope it would decrease violence at your establishment.

Since my letter, the Salisbury Police Department has responded to an additional twenty-six incidents at your nightclub.  Of these twenty-six incidents, eleven have been violence related.  Of the eleven, two of the cases involved the discharging of a handgun.

It is quite apparent to me that whatever measures you have taken are ineffective which creates a very unsafe condition.  I have discussed this continuing problem with the State's Attorney for Wicomico County who has also expressed grave concern for your staff, patrons and the police officers who respond to these incidents.

As a result of your inability to maintain a safe establishment, I will be seeking criminal sanctions based upon this history of violence at your establishment.

(J.A. 938). Chief Webster again copied the Liquor Board, State's Attorney Davis Ruark, and Salisbury Mayor Barrie Tilghman on his letter.

On the same day that Robert Orgain received Chief Webster's letter dated January 11, 2002, Robert Orgain telephoned Chief Webster to ask "what this was all about and what the nature of it was." (J.A. 2584). In response, Chief Webster declined to discuss the matter with Robert Orgain and informed him that he planned to meet with the State's Attorney and would get back to him after that.

Around the same date, Chief Webster informed Salisbury Mayor Barrie Tilghman of his intent to seek charges against the Orgains for maintaining a public nuisance. Also around the same date, Major Jeffrey Livingston, Salisbury's Assistant Police Chief, forwarded a list of Andromeda's Calls for Service to the State's Attorney for Wicomico County. Notably, no criminal sanctions or charges were ever actually filed against the Plaintiffs.

In a letter dated January 15, 2002, Robert Orgain responded in writing to Chief Webster's January 11, 2002 letter. Robert Orgain advised Chief Webster about steps taken at Andromeda, since Chief Webster's August 2001 letter, to increase security, such as physical examination of customers' purses and a full body screening utilizing a metal detector. He also advised

Chief Webster that he had fired an employee whom he had learned accepted cash in exchange for allowing customers to enter Andromeda through the rear door, thereby escaping security screening. Additionally, he stated that, as a result of the shooting incidents, "we have decided to close on Wednesday night for the foreseeable future and implement certain dress code and other additional preventative measures to further enhance the safety of our facility." (J.A. 941). Chief Webster never had another telephone conversation nor a letter exchange with Robert Orgain.

In separate letters, each dated February 7, 2002, Chief Webster notified seven other businesses that they too had excessive Calls for Service, including violence related calls, and urged such businesses to assist the SPD "in reducing the number of calls to your property." (J.A. 948). Of relevance to the Orgains' claim under the Equal Protection Clause, each letter notified the recipient that "[i]f you need assistance with this effort, contact Lieutenant Elmer Davis in our Community Affairs Section at 410-548-3165." Id.

Serious Calls for Service to Andromeda continued after Robert Orgain's January 15, 2002 letter to Chief Webster, albeit by a lesser amount. The most serious incidents were as follows. On Sunday, February 10, 2002, at 12:54 a.m., the SPD received a Call for Service in which the complainant advised that "HE WAS

- 10 -

BEATEN AND 750 DOLLARS WAS TAKEN FROM HIM LAST NIGHT AT THE ANDROMEDA." (J.A. 1078). On Sunday, May 12, 2002, at 2:34 a.m., the SPD received a Call for Service because, between 2:00 a.m. and 2:30 a.m., an Andromeda customer had been shot in Andromeda's parking lot as he was leaving the club. On Sunday, May 19, 2002, at 2:00 a.m., the SPD received a Call for Service to Andromeda, which the police blotter described as follows: "COMP ADVISED A SUBJECT PULLED A 10-32 OUT ON HIM. AS OFFICER WAS AWAITING THE ARRIVAL OF THE COMPLAINANT, OFFICER ADVISED SHOTS FIRED AT 0202 HRS, POSSIBLY TWO DIFFERENT SHOOTERS." (J.A. 1079). Each of these incidents occurred in the early morning hours of a hip-hop night.

Just two days before this latest shooting incident, on May 17, 2002, the Liquor Board issued the Orgains a second order to show cause why their liquor license should not be suspended or revoked. The Orgains were notified to appear before the Liquor Board at a hearing on the matter on June 4, 2002.

At such hearing, Major Livingston of the SPD, whom the Liquor Board had summoned as a witness, testified on behalf of the SPD. Major Livingston testified that from January 1, 2001 to May 2002, the SPD had received forty-four Calls for Service for Andromeda "that we felt were of a violent nature or had the potential for some type of violence." (J.A. 1000). Major Livingston summarized each of these forty-four calls, describing

Calls for Service relating to fights, disorderly conduct, large crowds, and shootings.  At no time did he mention hip-hop music or the racial composition of Andromeda's clientele.[3]

The Orgains had a full opportunity to be heard at the hearing before the Liquor Board.  In her testimony, Rebecca Orgain did not contend that any Calls for Service on the SPD's books were fabricated.  Indeed, she testified that Andromeda had placed most of the Calls for Service as part of its efforts to maintain order.  She attributed the violence related Calls for Service at Andromeda to a local criminal element and testified the club had hired off-duty police officers from Prince George's County in order to reduce the number of Calls for Service.

Robert Orgain supplemented his wife's testimony.  Among other things, he informed the Liquor Board that, after the May 12, 2002 shooting incident, Andromeda had begun barricading its parking lot at closing time.  This measure, he explained, was designed to prevent people bent on causing trouble from getting near the club when the crowd was letting out.

The Orgains called as a witness their adult son Ken Orgain, who worked at Andromeda.  He testified that, in his view, a lot of the problems at Andromeda were likely caused by eighteen to

---

[3] Calls For Service records from the middle of March 2002 to the middle of May 2002 were unavailable because of a computer virus that had infected the SPD's computer system.

twenty-one year olds who binge drink and then engage in mischief for lack of better things to do in Salisbury. The Orgains also called James Fountain Smith, who worked at Andromeda as a part-time disc jockey. He remarked during the hearing that Andromeda "'deal[s] with ninety percent more black people than other establishments.'" (J.A. 554) (alteration in original).

Towards the end of the hearing, the Liquor Board invited Assistant Wicomico County State's Attorney Beau Oglesby (State's Attorney Oglesby), who was attending the hearing as an observer, to speak. In response, he explained that Chief Webster had approached his office for guidance on whether Andromeda could be prosecuted under the nuisance laws. State's Attorney Oglesby advised the Liquor Board that his office had reviewed Andromeda's Calls for Service record, and was prepared to present evidence to a soon-to-be-convened grand jury. He stated that there was no telling whether the grand jury would indict, but that the degree of violence warranted a formal investigation.

The Liquor Board members questioned State's Attorney Oglesby, who opined that it was the responsibility of Andromeda, not the SPD, to maintain order. He suggested that the club use video cameras as a security device. He also stated that he did not see a similar pattern of violence at other county establishments.

The Board then asked for closing comments. Rebecca Orgain insisted that the violence occurring at Andromeda was symptomatic of a larger community problem. As proof, she entered into evidence the Calls for Service history for Brew River, a large restaurant/nightclub in Salisbury. She pointed out that Brew River had problems with violence similar to Andromeda even though Brew River's owner was highly experienced.[4]

Commenting on Rebecca Orgain's testimony, Liquor Board Commissioner W.C. Holloway stated that it was his understanding that Brew River's Calls for Service were largely traffic related. He also stated that the Liquor Board had a duty to protect the community from shootings.

Ultimately, the Liquor Board concluded the Orgains had violated Maryland Code Art 2B § 10-401(a)(2) and suspended their liquor license for thirty-five days. The Orgains did not avail themselves of their right to appeal the Liquor Board's decision to state court. Instead, on June 12, 2002, the Orgains surrendered their liquor license and permanently closed Andromeda.

---

[4] In the present case, Plaintiffs allege that Brew River serves a predominantly white clientele, and therefore, the SPD turned a blind eye to the violence at Brew River while clamping down on Andromeda. At no time during the hearing before the Liquor Board, did Plaintiffs make this argument.

On August 22, 2002, Plaintiffs filed the present civil action in the United States District Court for the District of Maryland, asserting both federal and state law claims. The Second Amended Complaint, the one relevant to the present appeal, names the following as defendants: (1) the City of Salisbury; (2) Chief Webster, in both his individual and official capacities; (3) Wicomico County; (4) Liquor Board Commissioner Shirley Gray, in both her individual and official capacities; (5) Liquor Board Commissioner Leo McNeil, in both his individual and official capacities; and (6) Liquor Board Commissioner W.C. Holloway, in both his individual and official capacities (collectively Defendants). The Second Amended Complaint alleged a total of six counts. Counts I, II, and III were based upon federal law, and Counts IV, V, and VI were based upon state law.

Only Counts I and III are at issue in the present appeal. Count I, brought pursuant to 42 U.S.C. § 1983, alleged Defendants violated Plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause, by treating Andromeda less favorably than other similarly situated night clubs. Count III, brought pursuant to 42 U.S.C. § 1981, alleges Defendants intentionally interfered with Plaintiffs' rights to form contracts with black customers and black disc jockeys.

Following discovery, Defendants moved for summary judgment on all counts. Plaintiffs then voluntarily dismissed Count VI (state law defamation) as to all Defendants and all counts as to Wicomico County, except for Count IV (violation of the Maryland Declaration of Rights). The district court granted Defendants' motion for summary judgment with respect to Counts I, II, and III and dismissed, without prejudice, Counts IV and V.

Following the district court's entry of final judgment in favor of Defendants, Plaintiffs noted this timely appeal. On appeal, Plaintiffs challenge the district court's grant of summary judgment with respect to Count I (Equal Protection) and Count III (§ 1981), in favor of (1) Chief Webster, in his individual and official capacities; (2) the City; and (3) Liquor Board Commissioners Shirley Gray, Leo McNeil, and W.C. Holloway, in their individual and official capacities.

II.

We review the district court's grant of summary judgment de novo. See Nat'l City Bank of Ind. v. Turnbaugh, 463 F.3d 325, 329 (4th Cir. 2006). Summary judgment is appropriate when, after adequate time for discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986). A genuine issue of fact exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the evidence presented must always be taken in the light most favorable to the non-moving party. See Smith, 84 F.3d at 675. However, "neither unsupported speculation, nor evidence that is merely colorable or not significantly probative will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (internal quotation marks, alteration marks, and citations omitted).

## III.

We first address Plaintiffs' challenge to the district court's grant of summary judgment in favor of Chief Webster in his individual capacity with respect to Count I, alleging violation of the Fourteenth Amendment's Equal Protection Clause. Plaintiff's challenge is without merit.

The Fourteenth Amendment's Equal Protection Clause states, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "limits all state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, 135 F.3d 275, 289 (4th Cir. 1998) (internal quotation marks & emphasis omitted).

Plaintiffs premise their Equal Protection claim against Chief Webster in his individual capacity on the following theories: (1) Chief Webster intentionally caused there to be a substantially greater police presence in the parking lot of Andromeda on hip-hop nights, which nights attracted predominantly black customers, than on non-hip-hop nights at Andromeda or on any night of the week at Brew River, which nights attracted predominantly white customers, in an effort to drive away black customers from Andromeda; (2) Chief Webster threatened Andromeda with prosecution of the nuisance laws, but did not so threaten Brew River, because Andromeda's customers on hip-hop nights were predominantly black, while Brew River's customers on any night of the week were predominantly white; and (3) Chief Webster intentionally refused to invite the Orgains to

- 18 -

contact Lieutenant Elmer Davis in the SPD's Community Affairs Section if they needed assistance with Andromeda's crime problems, which invitation he had expressly extended to other businesses in his February 7, 2002 letters.

At a macro level, Plaintiffs' Equal Protection claim against Chief Webster in his individual capacity theorizes that facially neutral laws and policies were applied against them in an intentionally racially discriminatory manner. See Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."); Williams v. Hansen, 326 F.3d 569, 584 (4th Cir. 2003) (allegation that facially neutral law or policy has been applied in an intentionally discriminatory manner states claim under the Equal Protection Clause of the Fourteenth Amendment). Notably, the Equal Protection Clause does not require Plaintiffs "to prove that the challenged action rested solely on racially discriminatory purposes." Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977). Rather, Plaintiffs need only establish that racial animus was one of several factors

that, taken together, moved Chief Webster to act as he did. Williams, 326 F.3d at 584-85.

Applying the legal principles we just set forth to Plaintiffs' first and second theories of liability, Plaintiffs, at the summary judgment stage, were required to proffer sufficient evidence for a reasonable jury to find that: (1) Andromeda, on hip-hop nights, was similarly situated to Andromeda on non-hip-hop nights and Brew River on any night of the week; and (2) Chief Webster intentionally caused a substantially greater police presence at Andromeda on hip-hop nights than Andromeda on non-hip-hop nights and Brew River on any night of the week and threatened Plaintiffs with prosecution for violation of the nuisance laws without similarly threatening Brew River, because Andromeda's customers on hip-hop nights were predominantly black. See Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) ("To succeed on an equal protection claim, [plaintiff] must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.") (internal quotation marks omitted).

Notably, we agree with Plaintiffs' argument that the district court erred in requiring them to prove, as an element of their Equal Protection claim against Chief Webster pertaining to the level of police presence at Andromeda on hip-hop nights,

that the SPD's level of presence at Andromeda on hip-hop nights was objectively unreasonable under the circumstances. While proof of objective unreasonableness, the touchstone of a Fourth Amendment violation, would be probative on the issue of discriminatory intent in the Equal Protection context, objective unreasonableness is not a stand-alone element of an Equal Protection claim. See Veney, 293 F.3d at 730; cf. Whren v. United States, 517 U.S. 806, 813 (1996) ("We think [our] cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). As our further analysis will explain, however, the district court's error in this regard was harmless.

As Plaintiffs' primary evidence in support of their allegation of substantially greater police presence at Andromeda on hip-hop nights, Plaintiffs offered an affidavit by Robert Orgain. In its Memorandum Opinion addressing Defendants' motion

for summary judgment, the district court accurately summarized

Robert Orgain's affidavit on this issue as follows:

> [Robert] Orgain stated that on hip hop nights, one to two Salisbury patrol cars (with one or two officers per car) would regularly park across the street from the club. He described the cars as being "intermittently present" for "limited periods throughout the evening." "Periodically," he added, "the police would be present near the property (one or two blocks away) where they could observe patrons leaving." According to [Robert] Orgain, the "police presence exuded the appearance of setting a trap."

> [Robert] Orgain also stated that the police patrolled the Andromeda parking lot. He observed at least one squad car and one officer on the lot "virtually every Wednesday night." On most hip hop nights, "multiple" patrol cars would enter the parking lot on "multiple occasions, perhaps as much as once every half hour."

(J.A. 566-67) (footnotes omitted).

> The district court immediately went on to explain:

> At the summary judgment hearing, the Court established that the police did not patrol inside Andromeda, and that they did not activate their emergency lights while parked or patrolling. Plaintiffs do not allege that the police set up roadblocks or checkpoints. Their core allegation, therefore, is of a "looming" police presence on hip hop nights. They contend that the police presence was excessive, that the police were more in evidence at Andromeda than they were at other Salisbury clubs, and that the police presence deterred customers from patronizing the club.

(J.A. 567).

Assuming _arguendo_ that Plaintiffs proffered sufficient evidence for a reasonable jury to find the SPD had a substantially greater presence at Andromeda on hip-hop nights

- 22 -

than at Andromeda on non-hip-hop nights and Brew River on any night of the week, we hold that Plaintiffs failed to proffer sufficient evidence for a reasonable jury to find that Andromeda, on hip-hop nights, was similarly situated to Andromeda on non-hip-hop nights or Brew River on any night of the week. See Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985) (Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."). From the record, a reasonable jury could only find that, in general, hip-hop nights at Andromeda presented a greater threat to public safety than non-hip-hop nights at Andromeda or any night of the week at Brew River. Cf. United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996) (criminal offenders are similarly situated for Equal Protection analysis "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them"). First, the SPD was not called upon by employees of Brew River, as it was by employees of Andromeda on hip-hop nights, to disperse unruly crowds after closing time. Second, despite the fact that Andromeda was generally open at least four nights per week between October 25, 2000 and January 11, 2002 (the date of Chief Webster's second warning letter to Robert Orgain), thirty-two of thirty-six Calls for Service to Andromeda relating to violent

crimes (88%) occurred on hip-hop nights. Third, many Calls for Service to Brew River relating to violent crimes were of a far less serious nature than the Calls for Service to Andromeda on hip-hop nights relating to violent crimes. For example, during the same time period of October 25, 2000 to January 11, 2002, Andromeda had three shooting incidents, each on a different hip-hop night, while Brew River had none. Also, during the same time period, there were two assaults on police officers at Andromeda, but none at Brew River. Fourth, Andromeda had two more shooting incidents in May 2002, each on a hip-hop night. Brew River never had a shooting incident.[5] In sum, we hold that Plaintiffs failed to proffer sufficient evidence on the similarly situated element of their substantially-greater-police-presence theory and their discriminatory-threat-of-prosecution theory, with respect to their Equal Protection claim, for such theories to survive Chief Webster's motion for summary judgment.

Although this failure of proof alone is sufficient for us to affirm the district court, we now turn to consider Plaintiffs' proffer of evidence on the racially discriminatory intent element of these same two theories. In this regard,

---

[5] Plaintiffs do not dispute that on March 3, 2002, Brew River had a Call for Service regarding a "Man with Gun," that turned out to be a false alarm. (J.A. 3100).

Plaintiffs primarily rely on the following: (1) during the time of Andromeda's operation, Plaintiffs contacted the NAACP on several occasions, suggesting that the SPD might be showing a stronger presence at Andromeda as compared to other night clubs in Salisbury, because of Andromeda's predominantly black clientele on hip-hop nights; (2) according to deposition testimony by Robert Orgain, on a hip-hop night in August 2001, SPD Officer Morto, who had responded to a midnight call from Andromeda for an ambulance for a man who had passed out waiting in line for admittance, referred to the approximately 100 to 150 primarily black customers waiting in line as a "[b]lack mob," (J.A. 2541); (3) according to deposition testimony by Andromeda employee Freedom Ford, following the January 2, 2002 shooting incident at Andromeda, SPD Detective Barry Tucker suggested to him that Andromeda should change its format on Wednesday nights from hip-hop to country or "something like that" to "keep the trouble away," (J.A. 2815); (4) when the owner of Club Vissage, also located in Salisbury, asked Chief Webster's advice regarding how to lessen the violence on hip-hop nights at his club, Chief Webster suggested tightening the dress code, stopping the serving of alcohol earlier in the evening, and changing the format to country western; (5) Chief Webster refused to return a phone call from Robert Orgain, which Robert Orgain made in response to Chief Webster's January 11, 2002

letter; (6) Chief Webster copied the Liquor Board, the State's Attorney, and the Mayor on his two warning letters to Robert Orgain, but did not copy the same officials on his February 7, 2002 letters to the seven other businesses in which Chief Webster requested management's assistance in reducing the number of Calls for Service; (7) Harry Tindall, Andromeda's chief of security, testified in deposition that his friend, SPD Officer Chris Davis, privately teased him for working at a "n----r club." (J.A. 2716). These anecdotal bits of circumstantial evidence, only three of which even directly pertain to Chief Webster, viewed collectively and in the light most favorable to Plaintiffs, fall decidedly short of the evidence necessary for a reasonable jury to find that any additional police presence at Andromeda on hip-hop nights, as compared to Andromeda on non-hip-hop nights or Brew River on any night of the week, was intentionally caused by Chief Webster, in part, because Andromeda's customers on hip-hop nights were predominantly black. The same goes for Plaintiffs' theory that Chief Webster threatened Andromeda with prosecution of the nuisance laws, but did not so threaten Brew River, because Andromeda's customers on hip-hop nights were predominantly black.

Indeed, a reasonable jury, viewing the evidence in the record, in the light most favorable to Plaintiffs, could only find that any comparable increase of police presence at

Andromeda on hip-hop nights and Chief Webster's threats to prosecute Andromeda under the nuisance laws were solely in response to Chief Webster's genuine concern for public safety, given not just the quantity, but the more serious nature of Andromeda's record of violent crimes on hip-hop nights and based upon his law enforcement experience. For example, Chief Webster did not send a letter to Robert Orgain regarding violence at Andromeda until a shooting incident had occurred. In fact, Chief Webster sent each of his letters to Robert Orgain the day after a shooting incident at Andromeda on a hip-hop night had occurred. Such evidence strongly indicates that the shooting incidents were a critical decision in Chief Webster's decision to recommend Andromeda for prosecution.[6] As Chief Webster testified in his deposition, without contradiction in the record, "the things that really concerned me and drew my attention to the Andromeda were the shootings, so the actual shootings that had taken place inside and outside the

---

[6] Chief Webster sent his first letter to Andromeda the day after the August 9, 2001 shooting incident. While Plaintiffs baldly deny in their brief that this shooting incident occurred, they have forecast no evidence that Chief Webster did not believe such incident had actually occurred nor any evidence to create a triable issue of fact that such incident never occurred.

Chief Webster sent his second letter on January 11, 2002, specifically referencing the fact that two incidents involving the discharge of handguns had recently occurred.

Andromeda." (J.A. 1692). In sum, assuming arguendo that Plaintiffs have forecast sufficient evidence for a reasonable jury to find that Andromeda on hip-hop nights was similarly situated to Andromeda on non-hip-hop nights and Brew River on any night of the week, Plaintiffs still lose on the intentional discrimination element. See Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach, 420 F.3d 322, 328-29 (4th Cir. 2005) (disparate treatment alone is insufficient to support constitutional remedy under Equal Protection Clause).

Similarly, Plaintiffs' theory that Chief Webster violated the Equal Protection Clause by failing to notify them by letter or otherwise that they could contact Salisbury's Community Affairs Division for help with their crime problem while doing so in letters to seven other businesses in Salisbury, fails for lack of evidence of racially discriminatory intent on the part of Chief Webster. As we just discussed, the record contains insufficient evidence for a reasonable jury to find that Chief Webster harbored racially discriminatory animus toward blacks. Moreover, Plaintiffs' theory here is severely undercut by the fact that one of the seven businesses to which Chief Webster sent a letter offering Lieutenant Elmer Davis as a helpful contact was Club Vissage, which club Keith Orgain, son of the Orgains and employee of Andromeda, stated in a sworn affidavit "catered to African Americans . . . ." (J.A. 2877). Any

- 28 -

finding that race played some role in Chief Webster's failure to notify Plaintiffs by letter or otherwise that they could contact Salisbury's Community Affairs Division for help with their crime problem would be purely speculative. See Bouchat, 346 F.3d at 522 (unsupported speculation will not suffice to defeat a motion for summary judgment).

In conclusion, we affirm the district court's grant of summary judgment in favor of Chief Webster in his individual capacity with respect to Count I, alleging violation of the Fourteenth Amendment's Equal Protection Clause.[7]

IV.

We next address Plaintiffs' argument that the district court erred in granting summary judgment in favor of the City and Chief Webster, in his official capacity, with respect to Count I, alleging violation of the Equal Protection Clause. We reject Plaintiffs' argument as without merit.

---

[7] To the extent Plaintiffs have made arguments on this issue that we have not specifically addressed, we find such arguments without merit.

We also note that although Chief Webster, in his individual capacity, raised the defense of qualified immunity with respect to Count I, the district court, having found no violation of the Equal Protection Clause, did not reach the merits of his qualified immunity defense. Neither do we.

- 29 -

Plaintiffs premise Count I against the City and Chief Webster, in his official capacity, on the theory that "the City and Webster, a policymaking authority, can be held liable for a policy of racially motivated selective enforcement that drove the Orgains out of business." (Plaintiffs' Reply Br. at 5-6). In support of this theory, Plaintiffs rely upon the same evidence they proffered in support of their Equal Protection claim against Chief Webster, in his individual capacity.

Treating Chief Webster in his official capacity as the City, Edwards v. City of Goldsboro, 178 F.3d 231, 244 & 244 n.8 (4th Cir. 1999), Plaintiffs' Equal Protection claim against the City fails, because "a municipality may not be found liable for a constitutional violation in the absence of an unconstitutional act on the part of at least one individual municipal actor." International Ground Transp. v. Mayor and City Council of Ocean City, Md., 475 F.3d 214, 219 (4th Cir. 2007). Accordingly, we affirm the district court's grant of summary judgment in favor of the City (and Chief Webster in his official capacity), with respect to Count I.

V.

We now turn to consider the Orgains' argument that the district court erred in granting summary judgment in favor of Liquor Board Commissioners Shirley Gray, Leo McNeil, and W.C.

Holloway (collectively the Liquor Board Commissioners), in their individual capacities, with respect to Count I, alleging violation of the Equal Protection Clause.[8] The Orgains theorize that the Liquor Board Commissioners violated their rights under the Equal Protection Clause by issuing a five-day suspension of their liquor license in December 2001 and subsequently issuing a thirty-five-day suspension of their liquor license in June 2002. With respect to the five-day suspension, the Orgains allege that the Liquor Board Commissioners treated them more harshly than the holder of the liquor license under which Brew River operated by imposing a fine-only punishment on such holder for under-age drinking violations, while imposing a fine plus a suspension on them for under-age drinking violations.

The Orgains' assignment of error on this issue is without merit. Below, the district court asked the Orgains to marshal their proof of racially discriminatory intent on the part of the Liquor Board Commissioners. The Orgains pointed to the following three factual circumstances: (1) the two orders suspending the Orgains' liquor license did not set forth detailed findings of fact; (2) a thirty-five-day suspension was the longest suspension ever issued by the Liquor Board; and (3)

---

[8] We agree with the district court that only the Orgains, as the actual holders of the liquor license under which Andromeda operated, have standing to sue the Liquor Board Commissioners.

during the June 4, 2002 hearing before the Liquor Board, James Fountain Smith, an assistant disc jockey at Andromeda remarked that Andromeda "'deal[s] with ninety percent more black people than other establishments.'" (J.A. 554) (alteration in original).

The district court concluded that no fair-minded jury could find that race played any role in the Liquor Board Commissioners' individual votes regarding the suspensions. In this regard, the district court first noted that the Liquor Board's Chairman, Leo McNeil, is himself black. By noting this fact, the district court was apparently relying upon the common sense notion that, as a member of the same race as the predominant number of Andromeda's customers on hip-hop nights, Liquor Board Commissioner Leo McNeil likely did not take the race of such customers into account in twice voting to suspend the Orgains' liquor license. See Neely v. United States Postal Serv., 2007 WL 4389473 (E.D.Pa. Dec. 12, 2007) ("Although the fact that a [decision-maker] is a member of the same protected class as the plaintiff does not preclude a successful discrimination claim, it substantially weakens any inference of discrimination."). Id. at *8 n.4. Second, the district court observed that no Maryland law required the Liquor Board to make factual findings when issuing a suspension. Third, the district court noted that Liquor Board Commissioner W.C. Holloway

testified during his deposition in this case, without contradiction, that the Liquor Board normally does not provide a factual summary in its orders of suspension. Fourth, with respect to the length of the thirty-five-day suspension, the district court observed that the record showed that, since 1977, the Liquor Board had handed down six, thirty-day suspensions, and that it added five more days to Andromeda's second suspension in order to include the July 4th holiday, because the Orgains told the Liquor Board that they experienced the biggest crime problems at Andromeda during holiday periods.

We agree with the district court that no fair-minded jury could find, based upon this evidence, that race played any role in the Liquor Board Commissioners' individual votes to suspend the Orgains' liquor license. We also add that, with respect to the five-day suspension, the Orgains have pointed to no evidence in the record that the Liquor Board Commissioners had any knowledge, at the time they issued such suspension, that Andromeda served a predominantly black clientele on hip-hop nights.[9] In conclusion, we affirm the district court's grant of

---

[9] We also note that the Orgains have not proven that Andromeda was similarly situated to Brew River with respect to the underage drinking violations for which the Orgains received the five-day suspension. Such suspension was based upon Andromeda's admission of five under-age drinkers, while Brew River's fine-only punishment was based upon its admission of only two under-age drinkers.

summary judgment in favor of the Liquor Board Commissioners in their individual capacities, with respect to Count I, alleging violation of the Equal Protection Clause.[10]

VI.

We also affirm the district court's grant of summary judgment in favor of the Liquor Board Commissioners, in their official capacities, with respect to Count I, alleging violation of the Equal Protection Clause. Treating the Liquor Board Commissioners in their official capacities as the Liquor Board, see Edwards, 178 F.3d at 244 & 244 n.8, the Orgains' Equal Protection claim against the Liquor Board fails. The record contains no evidence that in either decision by the Liquor Board to suspend the Orgains' liquor license, the Liquor Board Commissioners were acting pursuant to a policy or custom of the Liquor Board to discriminate against businesses serving predominantly black clientele. See Board of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 403-04 (1997)

_____

[10] To the extent Plaintiffs have made arguments on this issue that we have not specifically addressed, we find such arguments without merit.

We note that although the Liquor Board Commissioners, in their individual capacities, raised the defense of qualified immunity with respect to Count I, the district court, having found no violation of the Equal Protection Clause, did not reach the merits of such qualified immunity defense. Neither do we.

- 34 -

(county may be held liable under § 1983 only if it causes a deprivation of a constitutional right through a policy or custom).

VII.

Plaintiffs also challenge the district court's grant of summary judgment in favor of Chief Webster, in his individual capacity, and the City, with respect to Count III, alleging intentional interference with their rights to contract with black customers and black disc jockeys, brought pursuant to 42 U.S.C. § 1981. Plaintiffs' challenge is without merit.

Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. In the words of Justice Scalia for the Supreme Court: "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006).

Plaintiffs contend the district court erred in failing to analyze their § 1981 claim under the burden-shifting proof

scheme first set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), for employment discrimination claims. According to Plaintiffs, they can avail themselves of the <u>McDonnell Douglas</u> proof scheme in the § 1981 context, because they lack direct evidence of racial animus. See <u>Love-Lane v. Martin</u>, 355 F.3d 766, 786 (4th Cir. 2004) (plaintiff alleging race discrimination in violation of § 1981, based only upon circumstantial evidence, may seek to prove claim under <u>McDonnell Douglas</u>).

This issue need not detain us long. Plaintiffs seek to impose § 1981 liability on Chief Webster, in his individual capacity, based upon their theory that he interfered with their rights to contract with black customers and black disc jockeys, but did not do so with respect to Brew River, because Andromeda served a predominantly black clientele on hip-hop nights. Plaintiffs implicitly acknowledge that, in order to establish a <u>prima facie</u> case, under <u>McDonnell Douglas</u>, at the summary judgment stage, they must proffer sufficient evidence for a reasonable jury to find, <u>inter alia</u>, that Chief Webster treated them differently than a similarly situated club. <u>Cf.</u> <u>Love-Lane</u>, 335 F.3d at 802. Plaintiffs rely upon the same evidence in support of this element as they did in support of the similarly situated element of their Equal Protection claim against Chief Webster, in his individual capacity. Needless to say, the

record does not support a reasonable inference that Andromeda, on hip-hop nights, was similarly situated to Brew River on any night of the week.  Accordingly, we affirm the district court's grant of summary judgment in favor of Chief Webster, in his individual capacity, with respect to Count III.  Because Plaintiffs do not attempt to impose § 1981 liability upon the City upon any different evidence than it relied upon in support of its § 1981 claim against Chief Webster, in his individual capacity, we do the same with respect to the City.[11]

## VIII.

As their final issue, Plaintiffs contend the district court erred in failing to address the Liquor Board's assertion of Eleventh Amendment immunity below.  This issue is a nonstarter for Plaintiffs.  In light of the fact that the Liquor Board (i.e., the Liquor Board Commissioners sued in their official capacities) does not request affirmance on the basis of Eleventh Amendment immunity, if it is not necessary to do so, we too refuse to reach the merits of such Eleventh Amendment immunity defense.  See Strawser v. Atkins, 290 F.3d 720, 729 (4th Cir.

---

[11] To the extent Plaintiffs have made arguments in support of their § 1981 claims against Chief Webster, in his individual capacity, and the City, that we have not specifically addressed, we find such arguments without merit.

2002) (refusing to reach merits of Eleventh Amendment Immunity defense when defendant-officials only argued merits of the case and relied upon Eleventh Amendment Immunity defense only if necessary to prevent judgment against them on the merits).

## IX.

In conclusion, we affirm the entry of judgment with respect to Counts I and III.

<u>AFFIRMED</u>